**CHRISTINA HUMPHREY LAW, P.C.**
Christina A. Humphrey (SBN 226326)
1117 State Street
Santa Barbara, CA 93101
Telephone: (805) 618-2924
Facsimile: (805) 618-2939
Email: christina@chumphreylaw.com

**TOWER LEGAL GROUP, P.C.**
James A. Clark (SBN 278372)
Renee P. Ortega (SBN 283441)
11335 Gold Express Drive, Ste. 105
Gold River, CA 95670
Telephone: (916) 361-6009
Facsimile: (916) 361-6019
Email: james.clark@towerlegalgroup.com
Email: renee.parras@towerlegalgroup.com

[Attorneys for Plaintiffs]

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SALVADOR AQUINO, SUSAN FORD, MONICALAYLE GARCIA, BARBARA KRAUS, MARTHA LOPEZ, FRANCISCO MARTINEZ, MEGAN SARGENT, individually and as a representative of a Putative Class of Participants and Beneficiaries, on behalf of the 99 CENTS ONLY STORES 401(K) PLAN,<br><br>       Plaintiffs,<br><br>       v.<br><br>99 CENTS ONLY STORES LLC; THE RETIREMENT COMMITTEE OF THE 99 CENTS ONLY 401(K) PLAN; and DOES 1 through 20,<br><br>       Defendants. | Case No. 2:22-cv-01966<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>Judge: Hon. Stanley Blumenfeld, Jr |

FIRST AMENDED CLASS ACTION COMPLAINT

# **TABLE OF CONTENTS**

INTRODUCTION ……………………………………………………………………………..1

JURISDICTION AND VENUE…………………………………………………….……4

THE PARTIES…………………………………………………………………….........5

Plaintiffs…………………………………………………………….…………….…...5

Defendants……………………………...…………………………………….………..7

Parties in Interest…………………………………………………….……………....8

DEFENDANTS' FIDUCIARY OBLIGATIONS….…………………………………..8

DEFINED CONTRIBUTION 401(K) PLANS AND IMPACT OF EXCESSIVE

FEES……………………………………………………………………………........9

THE ESTABLISHEMENT OF THE TRUST AND THE DOCUMENTS RELIED UPON

FOR THE COMPLAINT'S ALLEGATIONS……………………………………..………11

FACTUAL ALLEGATIONS……………………………………………………........12

    A.    Defendants Caused the Plan Participants to Pay Excessive Fees and Lose Returns by Failing to Offer, Monitor, and Investigate Available Lower Cost Mutual Fund Share Classes as Plan Investment Options.………….………………….……...…...13

    B.    Defendants Paid Fidelity Unreasonable Fees, Failed to Monitor Fidelity, and Failed to make Requests for Proposals from Other CSPs…..………………………………………………………….…...22

    C.    Defendants Selected and Maintained Imprudent Funds that Fell Below the Reasonable Standard of Care by Failing to Utilize Lower Cost Passively.……………………………………………………….26

    D.    Defendants Failed to Offer Low-Cost Passively Managed Index Fund Alternatives.……………………………………………………..36

CLASS ACTION ALLEGATIONS……………………………………………..36

FIRST CAUSE OF ACTION Breach of Fiduciary Duty of Prudence (Against All Defendants)……………………………………………..………….38

-ii-

FIRST AMENDED CLASS ACTION COMPLAINT

SECOND CAUSE OF ACTION Breach of Fiduciary Duties in Violation of Duty to Investigate and Monitor Investments and Covered Service Providers (Against All Defendants) …………………………………………………………..…..40

PRAYER FOR RELIEF…………………………………………………………….43

FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs Salvador Aquino, Susan Ford, Monicalayle Garcia,  Barbara Kraus, Martha Lopez, Francisco Martinez, and Megan Sargent (collectively "Plaintiffs"), individually and as representatives of participants and beneficiaries of the 99 CENTS ONLY STORES 401(K) PLAN (the "Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§1001 et seq., on behalf of the Plan against the current Plan sponsor, 99 CENTS ONLY STORES, LLC ("99 Cents, The Company, Or Defendant"), THE RETIREMENT COMMITTEE OF THE 99 CENTS ONLY 401(K) PLAN, and John Does 1-20 (collectively the "Defendants"), for breaching their fiduciary duties in the management, operation and administration of the Plan.

### INTRODUCTION

1.      This action is brought by current and former participants / beneficiaries of the 99 CENTS ONLY STORES 401(K) Plan to recover mismanaged 401k retirement funds.  The 401k plan has become the dominant source of retirement savings for most Americans.  Unlike defined-benefit pensions, which provide set payouts for life, 401(k) accounts rise and fall with financial markets, and therefore, the proliferation of 401(k) plans has exposed workers to big drops in the stock market and high fees from Wall Street money managers.  This action is filed to recover more than $6.5M in funds owed back to the plan on behalf of participants / beneficiaries.  These retirement funds are significant to the welfare of the class.

2.      Federal law affords employers the privilege of enticing and retaining employees by setting up retirement and defined contribution plans pursuant to 26 U.S.C. §401 ("401(k) plans).  These plans provide employees investment options with tax benefits that inure to the benefits of the employees and, necessarily, to the employers by increasing the "net" compensation their employees receive via tax deferment.  To enjoy this benefit, employers must follow the rules and standards proscribed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et. seq.* ("ERISA").

-1-
FIRST AMENDED CLASS ACTION COMPLAINT

3.     The Defendants chose to accept the benefits of federal and state tax deferrals for their employees via a 401(k) plan, and the owners and executives of Defendant organizations have benefitted financially for years from the same tax benefits.  However, Defendants have not followed ERISA's standard of care.  This lawsuit is filed after careful consultation with experts and publicly available documents to return benefits taken from Plan participants by Defendants.

4.     99 Cents Only Stores, LLC (also branded as "The 99 Store") is an American deep discount retailer primarily operating in California and the Southwestern United States.  The company is based in City of Commerce, California, and is managed by its sole member, Number Holdings, Inc., a Delaware corporation that is also based in the City of Commerce, California.  99 Cents has developed a portfolio of approximately 394 different locations that are grouped in key markets across the United States.  The last known public information regarding 99 Cents Store from 2017 indicates that it generated total revenues of approximately $2.06 billion and reported net income of approximately $118 million.

5.     The Plan at issue is a defined contribution retirement plan or a 401(k) plan, established and in operation for at least six (6) years pursuant to 29 U.S.C. §1002(2)(A) and §1002(34) of ERISA, that enables eligible participants to make tax-deferred contributions from their salaries to the Plan.  As of December 31, 2020, the Plan had 2,715 participants with account balances and $69,907,378 in assets.

6.     ERISA imposes strict fiduciary duty of prudence on covered retirement plan fiduciaries. An ERISA fiduciary must discharge his responsibility "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters" would use. 29 U.S.C. § 1104(a)(1). A plan fiduciary must act "solely in the interest of [plan] participants and beneficiaries." *Id*. A fiduciary's duties include "defraying reasonable expenses of administering the plan," 29 U.S.C. § 1104(a)(1)(A)(ii), and a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015).

FIRST AMENDED CLASS ACTION COMPLAINT

7.      This case is another example of a larger plan filling its 401(k) plan with conflicted and expensive funds when identical, cheaper funds were available, and overpaying Covered Service Providers, when the Plan had more than sufficient bargaining power to demand low-cost administrative and investment management services and well-performing, low-cost investment funds. Specifically, 99 CENTS and its individual members breached their fiduciary duty of prudence to the Plan by:

a. Offering and maintaining higher cost share classes when otherwise identical lower cost class shares were available. This resulted in the participants paying additional unnecessary operating expenses that not only failed to add value to the participants but resulted in an unjustifiable loss of compounded returns;

b. Overpaying for Covered Service Providers by paying variable direct and indirect compensation fees through revenue sharing arrangements with the funds offered as investment options under the Plan;

c. Failing to engage in a competitive bidding process by submitting a Request for Proposal to multiple service providers including recordkeepers, shareholder service and financial advisers;

d. Imprudently choosing and retaining expensive funds that consistently failed to meet or exceed industry benchmarks;

e. Utilizing the recordkeeper's own proprietary target-date funds, which also served as the plan's qualified default investment alternative (QDIA);

f. Failing to follow Trust law guidance and offer low-cost, broadly diversified passively managed index funds as opposed to high-cost, conflicted actively managed funds; and

g. Failing to offer index fund alternative for participants who preferred not to trust their hard-earned dollars and retirement savings to hope and the luck of expensive and risky actively managed funds

8.      Plaintiffs were injured during the Relevant Time Period by the Defendants' lack of skill, flawed processes and imprudent decisions in breach of

-3-
FIRST AMENDED CLASS ACTION COMPLAINT

their fiduciary duties: (1) Defendants offered Plaintiffs, and Plaintiffs invested in, higher cost fund shares when otherwise identical lower cost shares were available which caused participants diminished investment returns in their 401(k) accounts; (2) Defendants permitted Plaintiffs and other Plan participants to be charged excessive service fees, which reduced participants' Plan account balances and caused them diminished investment returns; and (3) Defendants chose and continually offered Plaintiffs, conflicted, expensive, proprietary target date funds, which also served as the default investment as opposed to a myriad of other lower cost, unconflicted, prudent options The Defendant's choices harmed participants / beneficiaries by reducing their Plan account balances through high fees and diminished investment returns.

9.     Plaintiffs, individually and as the representatives of a putative class consisting of the Plan's participants and beneficiaries, bring this action on behalf of the Plan under 29 U.S.C. §§ 1132(a)(2) and (3) to enforce Defendants' liability under 29 U.S. C. §1109(a), to make good to the Plan all losses resulting from their breaches of fiduciary duties, and to restore to the Plan any lost profits. In addition, Plaintiffs seek to reform the Plan to comply with ERISA and to prevent further breaches of fiduciary duties and grant other equitable and remedial relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

10.     Plaintiffs bring this action pursuant to 29 U.S.C. §1132(a), which provides that participants or beneficiaries in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duty and other violations of ERISA for monetary and appropriate equitable relief.

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, because it is a civil action arising under the laws of the United States, and exclusive jurisdiction under ERISA §502(e)(1), 29 U.S.C. §1132(e)(1).

-4-

FIRST AMENDED CLASS ACTION COMPLAINT

12. This Court has personal jurisdiction over Defendants because it transacts business in this District, resides in this District, and/or has significant contacts with this District, and one or more Plaintiffs reside and were employed in this District, and because ERISA provides for nationwide service of process.

13. Venue is proper in this District pursuant to ERISA §502(e)(2), 29 U.S.C. §1132(e)(2), because the Plan is administered in this District, many violations of ERISA took place in this District, and Defendants conduct business in this District. Venue is also proper in this District pursuant to 28 U.S.C. §1391(b) because Plaintiffs were employed in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## THE PARTIES

*Plaintiffs*

14. Plaintiff Salvador Aquino resides in Corona, California, and was an employee of 99 Cents Only Stores, whose headquarters is located in this District at 4000 Union Pacific Ave., City of Commerce, California 90023. Aquino was a participant in the Plan under 29 U.S.C. § 1002(7) during the Relevant Time Period and upon information and belief invested in the some or all of the funds which are at issue in this action.

15. Plaintiff Susan Ford resides in Downey, California, and was an employee of 99 Cents Only Stores, whose headquarters is located in this District at 4000 Union Pacific Ave., City of Commerce, California 90023. Ford was a participant in the Plan under 29 U.S.C. § 1002(7) during the Relevant Time Period and upon information and belief invested in some or all of the funds which are at issue in this action.

16. Plaintiff Monicalayle Garcia resides in San Pablo California, and was an employee of 99 Cents Only Stores, whose headquarters is located in this District at 4000 Union Pacific Ave., City of Commerce, California 90023. Garcia is a participant in the Plan under 29 U.S.C. § 1002(7) during the Relevant Time Period

-5-
FIRST AMENDED CLASS ACTION COMPLAINT

and upon information and belief invested in some or all of the funds which are at issue in this action.

17. Plaintiff Barbara Kraus resides in Rancho Palos Verdes, Nevada, and was an employee of 99 Cents Only Stores, whose headquarters is located in this District at 4000 Union Pacific Ave., City of Commerce, California 90023. Kraus was a participant in the Plan under 29 U.S.C. § 1002(7) during the Relevant Time Period and upon information and belief invested in some or all of the funds which are at issue in this action.

18. Plaintiff Martha Lopez resides in West Covina, California, and was an employee of 99 Cents Only Stores, whose headquarters is located in this District at 4000 Union Pacific Ave., City of Commerce, California 90023. Kraus was a participant in the Plan under 29 U.S.C. § 1002(7) during the Relevant Time Period and upon information and belief invested in some or all of the funds which are at issue in this action.

19. Plaintiff Francisco Martinez resides in Fontana, California, and was an employee of 99 Cents Only Stores, whose headquarters is located in this District at 4000 Union Pacific Ave., City of Commerce, California 90023. Martinez is a participant in the Plan under 29 U.S.C. § 1002(7) during the Relevant Time Period and upon information and belief invested in some or all of the funds which are at issue in this action.

20. Plaintiff Megan Sargent resides in Hermitage, Tennessee, and was an employee of 99 Cents Only Stores, whose headquarters is located in this District at 4000 Union Pacific Ave., City of Commerce, California 90023. Sargent is a participant in the Plan under 29 U.S.C. § 1002(7) during the Relevant Time Period and upon information and belief invested in some or all of the funds which are at issue in this action.

21. Aquino, Ford, Garcia, Kraus, Lopez, Martinez, Sargent, and Soto (Plaintiffs) have standing under 29 U.S.C. §1132(a)(2) to bring this action on behalf

-6-
FIRST AMENDED CLASS ACTION COMPLAINT

of the Plan because Defendants' reckless and flawed actions caused actual harm to an ERISA plan in which the Plaintiffs participate. Plaintiffs suffered an injury in fact by investing in the higher cost mutual fund shares when lower cost shares of the same fund were available to the Plan; by paying excessive fees to Covered Service Providers and investing in the most expensive share class of Fidelity's conflicted target date funds. Defendants are liable to the Plan to make good the Plan's losses under 29 U.S.C. § 1109(a).

***Defendants***

22.     Defendant 99 CENTS ONLY STORES LLC ("99 CENTS") is the current sponsor and administrator of the Plan and maintains its principal place of business at 4000 Union Pacific Ave., City of Commerce, California 90023. This entity is registered with the State of California.

23.     Upon information and belief, Defendant Retirement Committee of the 99 Cents Only Stores 401(k) Plan assisted the Plan Sponsor and Administrator with the administration of the Plan.

24.     Defendant "Does" during the Relevant Time Period are unknown at this time and are named as "John Does" until the "Does" are known and can be named through amendment to this Complaint.  Plaintiffs anticipate amending the complaint to add more Defendants once the names of each member of the Retirement Planning Committee from all applicable years are discovered.

25.      "[W]here, as here, a committee or entity is named as the plan fiduciary, the corporate officers or trustees who carry out the fiduciary functions are themselves fiduciaries and cannot be shielded from liability by the company." *Stewart v. Thorpe Holding Co. Profit Sharing Plan*, 207 F.3d 1143, 1156 (9th Cir. 2000).

26.     99 CENTS, the Retirement Committee, and the Directors and Officers are fiduciaries to the Plan under 29 U.S.C. §1002(21)(A)(i) and (iii) because they have sole authority to amend or terminate, in whole or part, the Plan or the trust, and

have discretionary authority to control the operation, management and administration of the Plan, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

***Parties in Interest***

27.    Finally, although not named Defendants, the Covered Service Providers serve as "Parties of Interest" to this Litigation.  Fidelity Investments Institutional ("Fidelity") served as the recordkeeper and third-party administrator of the Plan and Fidelity Investments Institutional performs the recordkeeping services for the Plan.

28.  UBS Financial Services, Inc., serves as the Code 27 (Investment advisory (plan)) financial advisor to the Plan.

## DEFENDANTS' FIDUCIARY OBLIGATIONS

29.    ERISA and common law trusts impose strict fiduciary duty of prudence upon Defendants as Plan fiduciaries. 29 U.S.C. §1104(a)(1)(A) requires a plan fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" for the "exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

30.    29 U.S.C. §1104(a)(1)(B) and common law requires a plan fiduciary to discharge his obligations "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims."

31.    ERISA and common law further impose an independent obligation upon Defendants as Plan fiduciaries to diversify the investment options of the Plan. U.S. Code §1104(a)(1)(C) requires a plan fiduciary to "discharge his duties with

FIRST AMENDED CLASS ACTION COMPLAINT

respect to a plan solely in the interest of the participants and beneficiaries… by diversifying the investments of the plan so as to minimize the risk of large losses…"

32. ERISA and common law further impose an independent obligation upon Defendants as Plan fiduciaries to follow the documents and instruments governing the Plan, including the plan documents, its amendments, summary plan descriptions, and other formally issued plan documents. U.S. Code §1104(a)(1)(D) requires a plan fiduciary to act "in accordance with the documents and instruments governing the plan insofar as documents and instruments are considered consistent with the provisions of [Title I] or Title V."

33. A fiduciary's duties include a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015).

34. 29 U.S.C. §1106(a)(1)(C) and 29 U.S.C. §1108(b)(2) and common law allows a fiduciary of an employee benefit plan to enter into an agreement with a party in interest for the provision of administrative services such as recordkeeping to the Plan "if no more than reasonable compensation is paid therefor." Fidelity is a "party in interest" under 29 U.S.C. §1106(a)(1)(C).

35. 29 U.S.C. §1132(a)(2) and common law authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109.

36. Section 1109(a) and common law provides "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach."

## DEFINED CONTRIBUTION 401(K) PLANS AND IMPACT OF EXCESSIVE FEES

37. In a defined contribution plan, participants' retirement benefits are limited to the value of their own individual accounts, which is determined solely by employee and employer contributions plus the amount gained through investment in

the options made available in the plan less expenses. See 29 U.S.C. §1002(34). Typically, plan participants direct the investment of their accounts, choosing from the lineup of plan investment options chosen by the plan sponsor.

38.    Because retirement savings in defined contribution plans grow and compound over the course of the employee participants' careers, poor investment performance and excessive fees can dramatically reduce the amount of benefits available when the participant is ready to retire. Due to compounding, even small differences in fees and performance can result in vast differences in the amount of savings available at retirement. As the Supreme Court explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 135 S. Ct. at1825. Thus, violations and damages continue over time.

39.    The impact of excessive fees on employees' and retirees' retirement assets is dramatic. The U.S. Department of Labor has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 1–2 (Aug. 2013).[1]

40.    "As a simple example, if a beneficiary invested $10,000, the investment grew at a rate of 7% a year for 40 years, and the fund charged 1% in fees each year, at the end of the 40-year period the beneficiary's investment would be worth $100,175. If the fees were raised to 1.18%, or 1.4%, the value of the investment at the end of the 40-year period would decrease to $93,142 and $85,198, respectively. Beneficiaries subject to higher fees for materially identical funds lose not only the money spent on higher fees, but also "lost investment opportunity"; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time. A trustee cannot ignore the power the trust wields to obtain

[1] https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resourcecenter/publications/401kFeesEmployee.pdf

-10-

FIRST AMENDED CLASS ACTION COMPLAINT

favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected." *Tibble v. Edison International* (9th Cir. 2016) 843 F.3d 1187, 1198.

41.    The marketplace for retirement plan services is established and competitive. As of December 31, 2020, the Plan had 2,715 participants with account balances and $69,907378 in assets.  As a result, the Plan has tremendous bargaining power to demand low-cost administrative and investment management services and well-performing, low-cost investment funds.

## **THE ESTABLISHEMENT OF THE TRUST AND THE DOCUMENTS RELIED UPON FOR THE COMPLAINT'S ALLEGATIONS**

42.    Each year since the formation of the Plan, the Defendants' file Annual Returns/Reports of Employee Benefit Plan to the U.S. Departments of Treasury and Labor ("Forms 5500" which are "Open to Public Inspection" and downloaded from www.efast.dol.gov).

43.    The formation of an Employee Benefit Plan for employees is the creation of a trust, as noted by Justice Sotomayer's comments in *Thole v. US Bank* (2020) 140 S.Ct. 1615, 1625 [emphasis added]:

> **"ERISA expressly required the creation of a trust in which petitioners are the beneficiaries: "[A]ll assets" of the plan "shall be held in trust" for petitioners' "exclusive" benefit. 29 U. S. C. §§1103(a), (c)(1); see also §1104(a)(1). These requirements exist regardless whether the employer establishes a defined-benefit or defined-contribution plan.  §1101(a). Similarly, the Plan Document governing petitioners' defined-benefit plan states that, at "'all times,'" all plan  assets "'shall'" be in a "'trust fund'" managed for the participants' and beneficiaries' "'exclusive benefit.'"  App. 60– 61. \*\*\*This arrangement confers on the "participants [and] beneficiaries" of a defined-benefit plan an equitable stake, or a "common interest," in "the financial integrity of the plan." *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U. S. 134, 142, n. 9 (1985)."**

44.    The underlying allegations in this Complaint are based on the Defendants' actions at the time the conduct was certified and reported to the U.S. Departments of Treasury and Labor. The Plan Document used herein was the

FIDELITY BASIC PLAN DOCUMENT NO. 17, VOLUME SUBMITTER DEFINED CONTRIBUTION PLAN or sometimes referred to as the Defined Contribution Plan and Trust Document or "prototype" or "volume submitter." The Defendants did not provide all Plan governing documents on written requests on behalf of the employees representing the class so this information will need to be requested in discovery.

45. In addition to the prototype Plan Document, the underlying allegations in this Complaint are also based on Plaintiffs' documents as well as the Defendants' past Forms 5500 filed with U.S. Departments of Treasury and Labor found at www.efast.dol.gov, and mutual fund prospectuses found at https://www.sec.gov/edgar/searchedgar. The below chart summarizes the source of allegations:



46. The Form 5500 Series is part of ERISA's overall reporting and disclosure framework, which is intended to assure that employee benefit plans are operated and managed in accordance with certain prescribed standards and that participants and beneficiaries, as well as regulators, are provided or have access to sufficient information to protect the rights and benefits of participants and beneficiaries under employee benefit plans."

//

//

//

-12-

FIRST AMENDED CLASS ACTION COMPLAINT

# FACTUAL ALLEGATIONS

**A.**   **Defendants Caused the Plan Participants to Pay Excessive Fees and Lose Returns by Failing to Offer, Monitor, and Investigate Available Lower Cost Mutual Share Classes as Plan Investment Options.**

47.   The Plan offers 24-26 investment options,[2] including one collective trust fund with all remaining options mutual funds.  Defendants select the Plan's investment options.

48.   A mutual fund is a company that pools money from many investors and invests the money in securities such as stocks, bonds, and short-term debt. The combined holdings of the mutual fund are known as its portfolio. Investors buy shares in mutual funds. Each share represents an investor's part ownership in the fund and the income it generates.

49.   Mutual fund companies are regulated by the Securities and Exchange Commission ("SEC") under the Investment Company Act of 1940. The Securities Act of 1933 requires mutual fund companies to prepare and register with the SEC mutual fund shares offered to the public and to make a prospectus describing the mutual fund shares available to prospective investors.

50.   Mutual funds make a profit by charging investors operating expenses, which are expressed as a percentage of the total assets in the fund. Operating expenses include fund management fees, marketing and distribution fees, administrative expenses and other costs.

51.   A single mutual fund is effectively one portfolio managed by one investment adviser or team that may be offered through multiple "classes" of its shares to investors. Each class represents an identical interest in the mutual fund's

//

//

---

[2] There was no "brokerage window" option made available where the participant, through a designated brokerage account, could buy and sell a wide range of investments that are outside the limited scope of Plan's 24-26 menu options.

FIRST AMENDED CLASS ACTION COMPLAINT

portfolio. The principal difference between the classes is that the mutual fund will charge different marketing, distribution and service expenses depending on the share class chosen.

52.     For example, one share class in a mutual fund may charge an annual expense ratio of 1% of the gross assets of the fund, while a different share class in that same fund with the same advisors and the same investments and allocations charges an annual expense ratio of .50%. Thus, an investor who purchases the share class with a lower operating expense will realize a .50% greater annual return on his/her investment compared to an investor who purchases the share class with the higher operating expense. Generally, lower class shares are available to larger investors, such as 401(k) plans like the Plan.

53.     A Plan's fiduciaries must "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "**significantly different costs**."[1]  Adherence to these duties requires *regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident" or if there is a "superior alternative investment" to any of the plan's holdings.*[2]

54.     Since 2015, when all but the stable value and Fidelity Freedom target date funds were selected, Defendants have offered higher cost mutual fund share classes as investment options for the Plan even though lower cost class shares of those exact same mutual funds with the same attributes were readily available to the Plan throughout its duration.  All of the funds had sufficient assets and attributes to qualify for the lowest cost share classes available.

//

//

[1] Restatement (Third) of Trusts ch. 17, intro. note (2007); see also Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function.").

[2] Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt., 712 F.3d 705, 718-19 (2d Cir. 2013).

-14-

FIRST AMENDED CLASS ACTION COMPLAINT

**Summary Table (Figure A)**

|                                  | 2020 | 2019 | 2018 | 2017 | 2016 |
|----------------------------------|------|------|------|------|------|
| Total Funds #                    | 26   | 25   | 24   | 24   | 24   |
| Cheaper Shares Classes Available # | 25   | 24   | 23   | 23   | 10   |
| Cheaper Shares Classes Available % | 96%  | 96%  | 96%  | 96%  | 42%  |

55.     The following chart illustrates the differences in the operating costs and returns between the share classes chosen by Defendants and apart from the target date funds, the least expensive share class available at the time of selection.  The cheaper K6 target date fund share classes became available to the plan in 2017. These are funds that Defendants chose to include and presumably have continued to offer to participants as of December 31, 2020.  The fund name listed in the first row and shaded grey represents the share class chosen by Defendants.  The second fund name listed and <u>not</u> shaded represents the cheaper share class Defendants could have chosen.  The bolded line represents the difference in costs (expenses charged), the investment returns for the one- and annualized three- and five -year performance periods ending 12/31/2021. Additionally, to emphasize the harm caused by the Defendants' imprudent selection of high-cost share classes, the three and five-year cumulative returns are included. <u>The average annual return difference calculated from the cumulative total return (far right column) is higher than both the expense ratio and annualized five-year return in all but one case (the five-year information is not available for some investments though the harm to participants is also reflected in the three-year comparisons)</u>. <u>This difference represents the loss of compounding associated with higher expenses and the imprudence of using revenue sharing to pay Covered Service Providers.</u>

//

//

-15-

FIRST AMENDED CLASS ACTION COMPLAINT

**Summary of Losses from Defendants' Choice of Expensive Share Classes (Figure B)**

| Name | Expense Ratio % | 1-Year % | 3-Year % | 5-Year % | 3-Year Total | 3-Year % / 3* | 5-Year Total | 5-Year % / 5* |
|---|---|---|---|---|---|---|---|---|
| | | (Ending 12/31/21) | | | (Ending 12/31/21) | | | |
| T. Rowe Price Blue Chip Growth Advisor | 0.96 | 17.39 | 26.92 | 23.14 | 104.45 | | 183.14 | |
| T. Rowe Price Blue Chip Growth I | 0.56 | 17.85 | 27.42 | 23.64 | 106.88 | | 188.93 | |
| *Cost of Expensive Share Classes* | *-0.40* | *-0.46* | *-0.50* | *-0.50* | *-2.43* | *-0.81* | *-5.79* | *-1.16* |
| JPMorgan Equity Income I | 0.71 | 25.13 | 17.86 | 12.96 | 63.72 | | 83.92 | |
| JPMorgan Equity Income R6 | 0.46 | 25.44 | 18.16 | 13.23 | 64.97 | | 86.13 | |
| *Cost of Expensive Share Classes* | *-0.25* | *-0.31* | *-0.30* | *-0.27* | *-1.25* | *-0.42* | *-2.21* | *-0.44* |
| Eaton Vance Atlanta Capital SMID-Cap A | 1.17 | 21.92 | 21.96 | 16.34 | 81.41 | | 113.13 | |
| Eaton Vance Atlanta Capital SMID-Cap R6 | 0.82 | 22.33 | 22.38 | 16.73 | 83.29 | | 116.73 | |
| *Cost of Expensive Share Classes* | *-0.35* | *-0.41* | *-0.42* | *-0.39* | *-1.88* | *-0.63* | *-3.60* | *-0.72* |
| Allspring Special Mid Cap Value A | 1.14 | 28.24 | 21.27 | 11.34 | 78.34 | | 71.10 | |
| Allspring Special Mid Cap Value R6 | 0.71 | 28.80 | 21.79 | 11.82 | 80.65 | | 74.82 | |
| *Cost of Expensive Share Classes* | *-0.43* | *-0.56* | *-0.52* | *-0.48* | *-2.31* | *-0.77* | *-3.72* | *-0.74* |
| PGIM Quant Solutions Mid-Cap Val A | 1.14 | 34.27 | 14.54 | 6.21 | 50.27 | | 35.15 | |
| PGIM Quant Solutions Mid-Cap Val R6 | 0.74 | 34.86 | 14.99 | 6.64 | 52.05 | | 37.91 | |
| *Cost of Expensive Share Classes* | *-0.40* | *-0.59* | *-0.45* | *-0.43* | *-1.78* | *-0.59* | *-2.76* | *-0.55* |
| Franklin Small Cap Growth A | 1.03 | -0.73 | 23.04 | 17.01 | 86.27 | | 119.34 | |
| Franklin Small Cap Growth R6 | 0.65 | -0.35 | 23.56 | 17.49 | 88.64 | | 123.87 | |
| *Cost of Expensive Share Classes* | *-0.38* | *-0.38* | *-0.52* | *-0.48* | *-2.37* | *-0.79* | *-4.53* | *-0.91* |
| Victory Sycamore | 1.26 | 25.13 | 18.23 | 10.99 | 65.27 | | 68.43 | |

-16-

FIRST AMENDED CLASS ACTION COMPLAINT

|  | | (Ending 12/31/21) | | | | (Ending 12/31/21) | | |
| Name | Expense Ratio % | 1-Year % | 3-Year % | 5-Year % | 3-Year Total | 3-Year % / 3* | 5-Year Total | 5-Year % / 5* |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Small Company Opp A | | | | | | | | |
| Victory Sycamore Small Company Opp R6 | 0.86 | 25.60 | 18.69 | 11.41 | 67.20 | | 71.64 | |
| *Cost of Expensive Share Classes* | *-0.40* | *-0.47* | *-0.46* | *-0.42* | *-1.93* | *-0.64* | *-3.21* | *-0.64* |
| American Funds Europacific Growth R3 | 1.11 | 2.19 | 17.20 | 12.14 | 60.98 | | 77.34 | |
| American Funds Europacific Growth R6 | 0.46 | 2.84 | 17.95 | 12.87 | 64.09 | | 83.19 | |
| *Cost of Expensive Share Classes* | *-0.65* | *-0.65* | *-0.75* | *-0.73* | *-3.11* | *-1.04* | *-5.85* | *-1.17* |
| JPMorgan Government Bond I | 0.48 | -2.12 | 3.72 | 2.86 | 11.58 | | 15.14 | |
| JPMorgan Government Bond R6 | 0.35 | -1.99 | 3.88 | 3.00 | 12.10 | | 15.93 | |
| *Cost of Expensive Share Classes* | *-0.13* | *-0.13* | *-0.16* | *-0.14* | *-0.52* | *-0.17* | *-0.79* | *-0.16* |
| Pioneer Bond Y | 0.45 | 0.73 | 6.21 | 4.47 | 19.81 | | 24.44 | |
| Pioneer Bond K | 0.34 | 0.96 | 6.38 | 4.59 | 20.39 | | 25.16 | |
| *Cost of Expensive Share Classes* | *-0.11* | *-0.23* | *-0.17* | *-0.12* | *-0.58* | *-0.19* | *-0.72* | *-0.14* |
| Fidelity Freedom® 2005 | 0.47 | 3.92 | 8.59 | 6.62 | 28.05 | | 37.78 | |
| Fidelity Freedom® 2005 K6 | 0.37 | 4.07 | 8.69 | | 28.40 | | | |
| *Cost of Expensive Share Classes* | *-0.10* | *-0.15* | *-0.10* | | *-0.35* | *-0.12* | | |
| Fidelity Freedom® 2010 | 0.50 | 5.60 | 10.28 | 7.79 | 34.12 | | 45.51 | |
| Fidelity Freedom® 2010 K6 | 0.38 | 5.65 | 10.40 | | 34.56 | | | |
| *Cost of Expensive Share Classes* | *-0.12* | *-0.05* | *-0.12* | | *-0.44* | *-0.15* | | |
| Fidelity Freedom® 2015 | 0.54 | 7.26 | 11.93 | 8.90 | 40.23 | | 53.16 | |
| Fidelity Freedom® 2015 K6 | 0.40 | 7.38 | 12.09 | | 40.83 | | | |
| *Cost of Expensive Share Classes* | *-0.14* | *-0.12* | *-0.16* | | *-0.60* | *-0.20* | | |
| Fidelity Freedom® | 0.59 | 8.91 | 13.49 | 9.89 | 46.17 | | 60.25 | |

-17-

FIRST AMENDED CLASS ACTION COMPLAINT

| Name | Expense Ratio % | 1-Year % | 3-Year % | 5-Year % | 3-Year Total (Ending 12/31/21) | 3-Year % / 3* | 5-Year Total (Ending 12/31/21) | 5-Year % / 5* |
|---|---|---|---|---|---|---|---|---|
| 2020 | | | | | | | | |
| Fidelity Freedom® 2020 K6 | 0.42 | 9.07 | 13.66 | | 46.83 | | | |
| *Cost of Expensive Share Classes* | *-0.17* | *-0.16* | *-0.17* | | *-0.66* | *-0.22* | | |
| Fidelity Freedom® 2025 | 0.63 | 10.03 | 14.65 | 10.63 | 50.70 | | 65.72 | |
| Fidelity Freedom® 2025 K6 | 0.44 | 10.29 | 14.90 | | 51.69 | | | |
| *Cost of Expensive Share Classes* | *-0.19* | *-0.26* | *-0.25* | | *-0.99* | *-0.33* | | |
| Fidelity Freedom® 2030 | 0.67 | 11.46 | 16.21 | 11.82 | 56.94 | | 74.82 | |
| Fidelity Freedom® 2030 K6 | 0.46 | 11.69 | 16.45 | | 57.91 | | | |
| *Cost of Expensive Share Classes* | *-0.21* | *-0.23* | *-0.24* | | *-0.97* | *-0.32* | | |
| Fidelity Freedom® 2035 | 0.72 | 14.35 | 18.56 | 13.24 | 66.65 | | 86.21 | |
| Fidelity Freedom® 2035 K6 | 0.48 | 14.56 | 18.83 | | 67.79 | | | |
| *Cost of Expensive Share Classes* | *-0.24* | *-0.21* | *-0.27* | | *-1.14* | *-0.38* | | |
| Fidelity Freedom® 2040 | 0.75 | 16.48 | 19.94 | 13.94 | 72.54 | | 92.04 | |
| Fidelity Freedom® 2040 K6 | 0.50 | 16.70 | 20.25 | | 73.88 | | | |
| *Cost of Expensive Share Classes* | *-0.25* | *-0.22* | *-0.31* | | *-1.34* | *-0.45* | | |
| Fidelity Freedom® 2045 | 0.75 | 16.45 | 19.94 | 13.94 | 72.54 | | 92.04 | |
| Fidelity Freedom® 2045 K6 | 0.50 | 16.78 | 20.27 | | 73.97 | | | |
| *Cost of Expensive Share Classes* | *-0.25* | *-0.33* | *-0.33* | | *-1.43* | *-0.48* | | |
| Fidelity Freedom® 2050 | 0.75 | 16.50 | 19.94 | 13.96 | 72.54 | | 92.20 | |
| Fidelity Freedom® 2050 K6 | 0.50 | 16.79 | 20.25 | | 73.88 | | | |
| *Cost of Expensive Share Classes* | *-0.25* | *-0.29* | *-0.31* | | *-1.34* | *-0.45* | | |
| Fidelity Freedom® 2055 | 0.75 | 16.48 | 19.95 | 13.96 | 72.58 | | 92.20 | |
| Fidelity Freedom® 2055 K6 | 0.50 | 16.77 | 20.24 | | 73.84 | | | |

-18-

FIRST AMENDED CLASS ACTION COMPLAINT

| Name | Expense Ratio % | 1-Year % | 3-Year % | 5-Year % | 3-Year Total | 3-Year % / 3* | 5-Year Total | 5-Year % / 5* |
|---|---|---|---|---|---|---|---|---|
| | | | (Ending 12/31/21) | | | (Ending 12/31/21) | | |
| *Cost of Expensive Share Classes* | *-0.25* | *-0.29* | *-0.29* | | *-1.26* | *-0.42* | | |
| Fidelity Freedom® 2060 | 0.75 | 16.52 | 19.96 | 13.94 | 72.63 | | 92.04 | |
| Fidelity Freedom® 2060 K6 | 0.50 | 16.71 | 20.22 | | 73.75 | | | |
| *Cost of Expensive Share Classes* | *-0.25* | *-0.19* | *-0.26* | | *-1.12* | *-0.37* | | |
| Fidelity Freedom® 2065 | 0.75 | 16.49 | | | | | | |
| Fidelity Freedom® 2065 K6 | 0.50 | 16.75 | | | | | | |
| *Cost of Expensive Share Classes* | *-0.25* | *-0.26* | | | | | | |
| Fidelity Freedom® Income | 0.47 | 3.11 | 7.54 | 5.72 | 24.37 | | 32.06 | |
| Fidelity Freedom® Income K6 | 0.37 | 3.24 | 7.62 | | 24.65 | | | |
| *Cost of Expensive Share Classes* | *-0.10* | *-0.13* | *-0.08* | | *-0.28* | *-0.09* | | |
| Fidelity® Government MMkt | 0.42 | 0.01 | 0.70 | 0.82 | 2.11 | | 4.17 | |
| Fidelity® Government MMkt K6 | 0.25 | 0.01 | 0.78 | | 2.36 | | | |
| *Cost of Expensive Share Classes* | *-0.17* | *0.00* | *-0.08* | | *-0.25* | *-0.08* | | |

* The 3-Year %/3 and 5-Year %/5 figures illustrate that the cost to participants in lost returns is typically greater than the charged annual expenses. This lost return differential is not adequately expressed in the annualized figures, which is perhaps why the financial industry prefers to use them instead of cumulative total returns.

56.    By choosing and maintaining higher cost share classes for a decade (even before the statutory period) instead of available lower cost shares as illustrated above, Defendants caused Plan participants/beneficiaries harm by not just forcing them to pay higher fees, but also lost yield and returns they rely on for retirement income because of those higher fees on nearly every mutual fund offered through the Plan. In doing so, Defendants undermined the very purpose of the trust: Employee Retirement Income Security for participants/beneficiaries. The erosive effect of excessive fees and the resulting lost returns compounds over time.

-19-

FIRST AMENDED CLASS ACTION COMPLAINT

57.     Empirically speaking, revenue sharing burdens on mutual fund investors are always more costly to participants than the fee the revenue sharing is intended to pay. Since costs are inversely correlated to a fund investor's returns, when comparing share classes of the same SEC-registered mutual fund, the Defendants' actions were even more erosive to the trust's growth (and in turn the participants/beneficiaries account values) because of the loss of additional compounded growth.   Given the ample options available to pay service providers, Defendants should have investigated and prudently entered into a flat fee or capped arrangement with Fidelity that did not result in fees that reduced participants' cumulative returns.  Defendants failed to use the Plan's bargaining power to leverage lower cost mutual fund options for the Plan participants.

58.     Lastly, the information available for Defendants to make an informed assessment of the costs and returns available for each share class and to make the assessments noted above was readily available in each fund's annual prospectus at the time the choices were made.  For example, Defendants have included the Eaton Vance Atlanta Capital SMID-Cap Fund Class A shares ("Eaton Fund") as an investment option available to participants in 2016. The information provided in the 2016 annual prospectuses (in figure C below) clearly shows a significant difference in fees and investment returns between the Class A and Institutional Share Class. The Eaton Fund had an R6 share class available for eighty-eight basis points per year or .88%, but the Defendants selected the "A" share classes that cost one hundred twenty-two basis points or 1.22%.  While the difference in annual expenses is 0.34%, as illustrated in the table above, the five-year cumulative return difference is more than twice as much (0.72%), a difference that continues to grow over time. This is just one example of all but the Fidelity 500 Index fund.

//

//

//

-20-

FIRST AMENDED CLASS ACTION COMPLAINT

**Prospectus Excerpt Vance Atlanta Capital SMID-Cap (Figure C)**

| Shareholder Fees (fees paid directly from your investment) | Class A | Class C | Class I | Class R | Class R6 |
|---|---|---|---|---|---|
| Maximum Sales Charge (Load) Imposed on Purchases (as a percentage of offering price) | 5.75% | None | None | None | None |
| Maximum Deferred Dales Charge (Load) (as a percentage of the lower of net asset value at purchase or redemption) | None | 1.00% | None | None | None |

| Annual Fund Operating Expenses (expenses you pay each year as a percentage of the value of your investment) | Class A | Class C | Class I | Class R | Class R6 |
|---|---|---|---|---|---|
| Management Fee | 0.84% | 0.84% | 0.84% | 0.84% | 0.84% |
| Distribution and Service (12b-1) Fees | 0.25% | 1.00% | n/a | 0/50% | n/a |
| Other Expenses | 0.13% | 0.13% | 0.13% | 0.13% | 0.04% |
| Total Annual Fund Operating Expenses | 1.22% | 1.97% | 0.97% | 1.47% | 0.88% |

59.    Wasting the trust's money (i.e., participants/beneficiaries' money) violates subsections (A), (B) and (D) of ERISA Section 404(a)(1) above.  In devising and implementing strategies for the investment and management of trust assets, **trustees are obligated to "minimize costs**."  Uniform Prudent Investor Act (the "UPIA") §7.

60.    Additionally, an analysis of each attribute of the different share classes reveals that there is no difference between the share classes other than costs and performance returns, all borne by the participants.  For each of the available funds where Defendants could have offered a cheaper share class, the share classes all shared the same manager, manager start date, manager tenure, allocations in stocks, bonds, cash, same percentage of holdings, number of holdings, turnover rate, average price/earnings ratios, price/book ratios, and average market cap.

61.    Defendants did not systemically and regularly review or institute other processes in place to fulfill their continuing obligation to monitor Plan investments and reduce Plan costs, or, in the alternative, failed to follow the processes, as evidenced by:

-21-

FIRST AMENDED CLASS ACTION COMPLAINT

a.      Selecting higher cost share classes as Plan investment options when lower cost options of the same funds were available; and

b.      Continuing to retain higher cost share classes as Plan investment options when lower cost options of the same funds were available.

62.      Common sense reasons for the Defendants to "systematically and regularly" review (1) covered service providers (CSPs) and (2) the investment menu for participants/beneficiaries is because the Defendants must annually file certified Forms 5500 Schedule H, Line 4d identifying if there were any "non-exempt payments to parties in interest." To avoid perjury the Defendants must ensure the plan and trust's providers, as well as funds' manager's fees are "necessary for operation of the plan."  That means that reviewing the trust's providers and funds every three to six months or at minimum annually gives the Defendants time to avoid a "failure to act" violation.

63.      A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper share classes available and transferred the Plan's investments in the above-referenced funds into the lower share classes at the earliest opportunity.   The total amount of excess mutual fund expenses paid by Plan participants over the past six years, which correspondingly reduced the return on the Plan participants' investments, resulted in millions of dollars of damages to participants.

**B.      Defendants Paid Fidelity Unreasonable Fees, Failed to Monitor Fidelity, and Failed to make Requests for Proposals from Other CSPs**

64.      Since at least 2009, Fidelity ("covered service provider or CSP") has served as the Plan's recordkeeper and is one of the six largest recordkeepers in the United States.

65.      Defendants have a duty to prudently select covered service providers (CSP). Courts that have considered the issue have made it clear that "the failure to exercise due care in selecting . . . a fund's service providers constitutes a breach of a

FIRST AMENDED CLASS ACTION COMPLAINT

trustee's fiduciary duty." 28 U.S.C. § 1108(b)(2) states services must be necessary for the plan's operation.  Department of Labor guidance has also emphasized the importance of prudently selecting service providers.[3] The DOL has observed that, when selecting a service provider, "the responsible plan fiduciary must engage in an objective process." *Id*. Such a process must be "designed to elicit information necessary to assess the qualifications of the service provider, the quality of the work product, and the reasonableness of the fees charged in light of the services provided." *Id*. Furthermore, "such process should be designed to avoid self-dealing, conflicts of interest or other improper influence." *Id*.  Although the DOL has offered such general guidance, it has also cautioned that prudent selection of a service provider "will depend upon the particular facts and circumstances." *Id*.

66.    Recordkeeping is a necessary service for every defined contribution plan. Recordkeeping services for a qualified retirement plan, like the Plan, are essentially fixed and largely automated. It is a system where costs are driven purely by the number of inputs and the number of transactions. In essence, it is a computer-based bookkeeping system.

67.    The cost of recordkeeping and administrative services depends on the number of participants with an account balance, not the amount of assets in the participant's account.

68.    The greatest cost incurred in incorporating a new retirement plan into a recordkeeper's system is upfront setup costs. After the Plan account is set up, individual accounts are opened by entering the participant's name, age, SSN, date of hire and marital status. The system also records the amount a participant wishes to contribute each pay period through automated payroll deductions. Participants can go on-line and change their contribution rate at any time.

69.    There are numerous recordkeepers in the marketplace who can provide a high level of service to the Plan, and who will readily respond to a request for

---

[3] DOL Info. Letter to Theodore Konshak (Dec. 1, 1997).

-23-

FIRST AMENDED CLASS ACTION COMPLAINT

proposal. These recordkeepers primarily differentiate themselves based on service and price, and vigorously compete for business by offering the best service for the best price.

70.    Because the cost of recordkeeping services depends on the number of participants, not on the amount of assets in the participant's account, the cost of providing recordkeeping services to a participant with a $100,000 account balance is the same for a participant with $1,000 in her retirement account.

71.    Recordkeepers for defined contribution plans are generally compensated in two ways: First, through direct payments from the plan (participants) or employer; and second, through indirect payments via a practice known as revenue sharing.

72.    In a revenue sharing arrangement, a mutual fund or other investment vehicle directs a portion of the expense ratio—the asset-based fees it charges to investors—to the 401(k) plan's recordkeeper putatively for providing marketing, recordkeeping and administrative services for the mutual fund. These fees include: Rule 12b-1 fees, which are paid by the mutual funds to the recordkeeper as compensation for its services and expenses in connection with the sale and distribution of fund shares; shareholder service fees; and sub-transfer agency fees. The payments are **not** tied to actual expenses incurred by the recordkeeper for services rendered. Because 12b-1 fees were instituted to market and distribute mutual fund shares with the objective of obtaining sufficient economies of scale to reduce fund expenses, it is an ironic abuse of the fee to charge captive participants an additional fee to effectively market and distribute shares to themselves.

73.    Because revenue sharing arrangements pay recordkeepers asset-based fees, to the extent prudent fiduciaries would consider utilizing revenue sharing to pay CSPs, they would necessarily monitor the total amount of revenue sharing a recordkeeper receives to ensure that the recordkeeper is not receiving unreasonable compensation.  A prudent fiduciary ensures that the recordkeeper rebates to the plan all revenue sharing payments that exceed a reasonable per participant recordkeeping

-24-

FIRST AMENDED CLASS ACTION COMPLAINT

fee that can be obtained from the recordkeeping market through competitive bids. Yet, even this arrangement is flawed because the delay between taking the fee and rebating the credit ensures the loss of returns and it is typically impossible to consistently and accurately ensure affected participants are receiving the credit.

74. Because revenue sharing payments are asset based, they bear no relation to the actual cost to provide services or the number of plan participants and can result in payment of unreasonable recordkeeping fees. To put it another way, recordkeepers (or any other CSP) receiving unchecked revenue sharing compensation accrue significant ongoing pay increases simply because of participants putting money aside biweekly for retirement. Additional funds come from interest, dividends, and capital gains. Based on the Form 5500 record between 2015 and 2020, contributions totaled $47,864,866 (or an average of $7,977,478/year); every dollar of these contributions triggered additional revenue sharing revenue without the requisite additional labor.

75. Based on the direct and indirect compensation levels shown on the Plan's Form 5500s filed with the Department of Labor between 2010 and 2019, the Plan paid much more than a reasonable fee for Fidelity's services, resulting in the Plan paying excessive recordkeeping fees. The below chart demonstrates that the Plan consistently paid more for the same services than other Plans' of similar size with similar account balances.

//

//

//

//

//

//

//

//

//

-25-
FIRST AMENDED CLASS ACTION COMPLAINT

**99 Cents cost per Participant Comparison (Figure D)**

| Cost per Participant w/ Balances | Plan Name | Participants: w/ Account Balances |
|---|---|---|
| $48.39 | FREEDOM FINANCIAL NETWORK LLC | 2,422 |
| $48.45 | WEST MARINE PRODUCTS INC | 1,103 |
| $48.61 | BIG 5 CORP | 2,548 |
| $49.19 | BROKER SOLUTIONS INC | 2,258 |
| $50.22 | SAN ANTONIO REGIONAL HOSPITAL | 2,508 |
| $55.04 | RESTORATION HARDWARE INC | 4,114 |
| $56.84 | ONESMILE LLC | 5,085 |
| $57.33 | PECHANGA DEVELOPMENT CORPORATION | 3,083 |
| $58.39 | HFT HOLDINGS INC | 5,396 |
| $60.93 | MEMORIAL HEALTH SERVICES | 2,790 |
| $65.64 | THUNDER VALLEY CASINO | 1,964 |
| $66.98 | PEETS COFFEE & TEA LLC | 1,687 |
| $67.39 | ZOOM VIDEO COMMUNICATION INC | 2,365 |
| $69.05 | MERUELO ENTERPRISES INC | 4,468 |
| $69.48 | FOUNDATION BUILDING MATERIALS LLC | 3,204 |
| **$90.54** | **99 CENTS ONLY STORES LLC** | **2,715** |

76.    Failing to align CSP fees with industry benchmarks shifts the burden to the Defendants to justify allowing participants to pay unreasonably high fees. The unreasonable fees paid to Fidelity through its revenue sharing arrangements directly resulted from Defendants' failing to monitor Fidelity's fees and compare it with other service providers and market rates.

**C.    Defendants Selected and Maintained Imprudent Funds that Fell Below the Reasonable Standard of Care by Failing to Utilize Lower Cost Passively Managed Funds**

77.    As noted supra, ERISA is derived from trust law. *Tibble*, 135 S. Ct. at 1828. Accordingly, appropriate investments for a fiduciary to consider are "suitable index mutual funds or market indexes (with such adjustments as may be appropriate)." Restatement (Third) of Trusts § 100 cmt. b (1).

-26-

FIRST AMENDED CLASS ACTION COMPLAINT

78.    It is commonly stated by defendants in 401(k) lawsuits that ERISA does not require fiduciaries to choose index funds and they have argued that it is improper to pare actively managed funds against passively managed funds because it is an "apples and oranges comparison." While the former is true, the latter is not. An active manager may have varying degrees of flexibility with respect to the investment decisions they make such as whether to buy or sell a stock (or bond), portfolio weighting and length of holding time, but, they are pulling from the same pool of stocks (or bonds). A mutual fund investor looking for large-cap growth exposure can consider the merits of both active and passive funds. With respect to a trust, however, plan fiduciaries held to a prudent expert standard do not have the luxury of opting for actively managed funds to the exclusion of their passive counterparts. To select an actively managed fund a trustee must answer, and continually answer, what benefit is derived from the greater costs of an active manager. As stated in Restatement of Trusts, third, *the greater the trustee's departure from one of the valid passive strategies, the greater is likely to be the burden of justification and of continuous monitoring.*   Reporter's General Note of Section 227 of the Restatement 3rd of Trusts (Prudent Investor Rule), comments e through h, page 79.

79.    While higher-cost mutual funds may outperform a less-expensive option, such as a passively-managed index fund, over the short term, they rarely do so over a longer term.  *See* Jonnelle Marte, Do Any Mutual Funds Ever Beat the Market?  Hardly, The Washington Post, available at https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutual-funds-ever-beat-the-market-hardly/ (citing a study by S&P Dow Jones Indices which looked at 2,862 actively managed mutual funds, focused on the top quartile in performance and found most did not replicate performance from year to year); *see also* Index funds trounce actively managed funds: Study, available at

FIRST AMENDED CLASS ACTION COMPLAINT

https://www.cnbc.com/2015/06/26/index-funds-trounce-actively-managed-funds-study.html/ ("long-term data suggests that actively managed funds "lagged their passive counterparts across nearly all asset classes, especially over the 10-year period from 2004 to 2014.")

80.    Indeed, funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009) (hereinafter "When Cheaper is Better"); see also Jill E. Fisch, Rethinking the Regulation of Securities Intermediaries, 158 U. Pa. L. Rev. 1961, 1967-75 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

81.    During the Class Period, Defendants failed to consider and monitor materially similar but cheaper alternatives to the Plan's investment options.  This failure is a further indication that Defendants lacked a prudent investment monitoring process.

82.    The chart below demonstrates the higher expense ratios and substantial investment losses (over 6 years) of certain of the Plan's investment options when analyzed against comparable passively-managed funds in the same investment style.  The actively managed funds were more expensive by multiples year over year, while sustaining large losses on multiple occasions, meaning Defendants had multiple opportunities to remove the funds and replace them. The chart below uses 12/31/2021 expense ratios and 6 year cumulative returns as an example, which includes cumulative losses due to excess expenses present each year of the putative class period as a methodology to demonstrate the excess expense and substantial losses the Plan's funds sustained than their alternative fund counterparts.

//
//

-28-

FIRST AMENDED CLASS ACTION COMPLAINT

**Active v. Passive Comparison of Expenses and Losses (Figure E)**

| Current Fund | Expense | Comparable Index Fund | Expense | Excess Expense % | Current vs Index Total Return Lag 6-Year Ending 12/31/2021* |
|---|---|---|---|---|---|
| T. Rowe Price Blue Chip Growth Advisor | 0.96 | TIAA-CREF Large-Cap Gr Idx Instl | 0.05 | 1920% | -44.52% |
| Eaton Vance Atlanta Capital SMID-Cap A | 1.17 | Vanguard Mid-Cap Growth Index Admiral | 0.07 | 1671% | -29.74% |
| PGIM Quant Solutions Mid-Cap Val A | 1.14 | Vanguard Mid-Cap Value Index Admiral | 0.07 | 1629% | -33.17% |
| Franklin Small Cap Growth A | 1.03 | Vanguard Small Cap Growth Index Admiral | 0.07 | 1471% | -4.09% |

83. These comparators are appropriate because they, *inter alia*, have the same or similar investment goals and select stocks out of the same pools.

84. For example, the T. Rowe Price Blue Chip Growth fund and the TIAA-CREF Large-Cap comparator both seek similar growth opportunities within the Russell 1000 Growth Index – the largest growth-oriented companies.

85. According to Morningstar®, the large-cap growth category is made up of stocks of large-cap companies that are projected to grow faster than other large-cap stocks. Stocks in the top 70% of the capitalization of the U.S. equity market are defined as large cap. Growth is defined based on fast growth (high growth rates for earnings, sales, book value, and cash flow) and high valuations (high price ratios and low dividend yields). Market capitalization (market cap) refers to the total value of a company's shares of stock. In most cases, large-cap growth funds including T. Rowe Price Blue Chip Growth, will invest at least 80% of their assets in stocks that would fall into the large-cap growth asset class as defined above.

86. In the case of T. Rowe Price Blue Chip Growth, 56% of its assets are invested in its top-10 holdings. Eight of the ten holdings are the same as the top-10 holdings of the Russell 1000 Growth Index. Those eight stocks make up 52%

-29-

FIRST AMENDED CLASS ACTION COMPLAINT

of the fund's assets.

87. Likewise, with the TIAA-CREF Large-Cap fund, because it closely mirrors the Russell 1000 Growth Index, those same eight stocks similarly make up 52% of the fund's assets.

88. Indeed, T. Rowe Price's marketing materials compare the fund's performance to the Russell 1000 Growth Index, confirming that the fund's purpose, as with the TIAA-CREF Large-Cap fund is to achieve growth by investing in large cap securities. The first figure is from the 2014 T. Rowe Price Semi-Annual Report, a reference to the Russell 1000 Growth index and an example of the risks of actively managed funds (highlighted), which was available to Defendants during the putative class period.



-30-

FIRST AMENDED CLASS ACTION COMPLAINT

The below is a fact sheet from TRowe's marketing material comparing its fund to the Russell 1000 Growth Index.



89.    Moreover, the TIAA-CREF Large-Cap fund is one of the most widely available and offered Russell 1000 Growth-tracking indexes with a 20-year track record and it is therefore not merely a comparator to T. Rowe Price Blue Chip Growth, but arguably the best comparator.

90.    A passively managed large-cap growth index fund typically invests in all, or at least a large representative group of stocks within the category. The difference between the two funds is not a matter of investment strategy or type,

-31-

but more akin to the difference between an organic apple from Whole Foods and the conventional apple from Ralph's – one might perform better than the other, but they are fundamentally designed to be used the same way and for the same tasks.

91.    Plan participants would seek out these funds for identical investment purposes.

92.    However, the TIAA-CREF Large-Cap fund has and had lower fees throughout the putative class period, which over time have led to better investment outcomes for participants.

93.    In this regard, between 2007 and 2016, the TIAA-CREF fund performed 1.54 points better than the T. Rowe Price fund, because the fees paid for active management of the T. Rowe Price fund, additional trading costs common to many actively managed funds and active manager risk (portfolio managers must be right both when buying (or opting not to buy) a stock, as well as when to sell using the same readily available information used by "the market" to appropriately price a security), eroded any difference in performance between the two funds and rendered the TIAA-CREF fund the better choice.

94.    The same holds true for the other comparators, they are selected because they have same investment goals and look to invest in the same types of companies and are widely available funds with long track records.  Defendants should have chosen the alternative counterparts or similar counterparts.

95.    The Eaton Vance Atlanta Capital SMID-Cap A (EAASX) appears to have been chosen because of outperformance against its peers in 2015, ignoring however, a past littered with poor performance. As a risky highly concentrated portfolio (historically holding between 45 and 55 stocks), the fund is prone to feast or famine returns, which was clear in the decade prior to selection and thereafter. Against both its prospectus benchmark (Russell 2500) and category index (Russell Mid Cap Growth), the fund lagged in over half of the ten years prior to selection (2005 through 2014), including the three years immediately

prior to selection. The fund's risky strategy and reliance on brief periods of outperformance to justify its inclusion illustrates a lack of skill and care for participants who frequently do not have many years to recover from bad or ill-timed bets.

96.    Once again, the actively managed fund was outperformed by its passive comparator in five of the eight years prior to its selection as an investment choice.

97.    To put the fund's high level of risk in a different context, in the ten years prior to selection (2005 through 2014), it ranked in the top quartile in three years, but the third in five and bottom quartile in two, including in 2014, the last observable year before it was selected.

98.    This trend continued.  From 2016 to 2021, the Eaton Vance fund performed in the 74th percentile compared to its Morningstar-determined peers, nearly the bottom quartile.

99.    Eaton Vance Atlanta Capital SMID-Cap should never have been selected because of the lack of observable manager skill and reasonable likelihood that any outperformance could be sustained to justify its high costs. It could and should have been replaced with a better performing and lower fee fund such as the Vanguard fund, which, as noted, outperformed it by nearly 30% during the same period at a fraction of the cost and relative risk.

100.   PGIM Quant Solutions Mid Cap Value was chosen based on a flawed and reckless process of relying on short-term outperformance rather than evaluating the fund's total history. While in the ten years prior to selection (2005 through 2014) the fund outperformed its prospectus benchmark (and the same category index) in six, it lagged its benchmarks in eight of the 16 years beginning in 1999, including a six-year run of lagging returns. Its subsequent awful returns relative to any meaningful measure after selection should not have been a surprise. The harm caused to participants was so apparent the fund should have been replaced much sooner than 2020 (when it was ultimately replaced).

-33-

FIRST AMENDED CLASS ACTION COMPLAINT

101.   As with the Eaton Vance fund, PGIM's selection also may have been influenced by finder's fees. Under the section Payments to Financial Intermediaries on page 6, the fund's 2015 prospectus details the conflict of interest of financial incentives for promoting this option.

102.   Unfortunately, Defendants employed the same investment selection strategy when choosing PGIM's replacement: Wells Fargo Special Mid Cap Value (subsequently rebranded Allspring). In the ten years prior to selection (2010 through 2019) the fund lagged in five. Looking back a full 15 years (2005 through 2019) the fund lagged its prospectus (and category index) in nine (60%), demonstrating no management skill or justifiable expectation that its extra expenses would benefit participants. In an obvious reliance on short-term performance for fund selection, Allspring ranked in the top decile relative to its peers in 2019. That stunning return evaporated in the subsequent years so participants not only failed to benefit from the one year of outperformance, their fund replacement lagged the fund it replaced by 6% in 2021.

103.   According to the 2019 prospectus, however, the participants' loss was investment advisor's gain, as UBS was yet again eligible to receive a finder's fee for recommending the replacement Allspring fund.

104.   So too, with the Franklin Small Cap Growth A, it is compared to the Vanguard Small Cap Growth Index Admiral, a widely available fund with a long track record that selects stocks of the same ilk and would appeal to investors with substantially the same investment goals and much lower costs.

105.   Between 2005 and 2014 (the year prior to selection), the Vanguard fund performed Franklin 9.02 points better than the Franklin fund because of the additional fees, transaction costs and active manager risk.

106.   Between 2001 (the first full year after inception) and 2014 (year prior to selection) Franklin lagged its prospectus benchmark half the time, including 2014, demonstrating no discernable skill to justify forcing participants to pay higher expenses. Participants were harmed for the next three years as

-34-
FIRST AMENDED CLASS ACTION COMPLAINT

Franklin continued to lag its benchmarks.

107.   Moreover, even when compared to the broader Morningstar category of similar fund types, there is no reason the Franklin fund should have been selected or should have been selected over a passively managed funds with lower fees.

108.   From 2004 to 2016, the Franklin fund was in the 3rd or 4th quartile of performance compared to its Morningstar category peer funds eight times, including four times in the 4th quartile. This is noted only to emphasize that Plaintiffs do not seek to "cherry pick" alternatives but rather emphasize that there were a multitude of potential options, including the well-known and oft-used passively managed, low-cost and broadly diversified Vanguard alternative.

109.   Likewise, from 2016 to 2021, the Franklin fund was in the 62nd percentile of performance compared to its Morningstar-determined peers, worse than well over half of its peers.

110.   It could and should have been replaced with a better performing and lower fee fund such as the Vanguard fund, which, as noted, outperformed it by over 4% during, not only the limitations period, but also the ten years ending December 31, 2016 and over 9% ending December 31, 2014 (the year prior to selection).

111.   Beyond the fact that the funds selected were either poor choices from the outset or did not perform and should have been replaced, the choice of actively managed fund with high fees selected by Defendants cannot be justified by a risk-benefit analysis.

112.   In short, these funds were bad investment choices and reflect a defective fund selection process because the benefit they might provide by outperforming passively managed index funds was far exceeded by the risk that they would be outperformed by those index funds, especially when considering the mutual funds' management fees and other expenses.

//

-35-
FIRST AMENDED CLASS ACTION COMPLAINT

**D.    Defendants Failed to Offer Low-Cost Passively Managed Index Fund Alternatives**

113.    Defendants also breached their fiduciary duty by failing to offer more than a single index fund.

114.    At the time the other funds listed above were added, Defendants prudently added Fidelity 500 Index, though it was the sole low-cost passively managed index fund option available to participants.

115.    Plan fiduciaries cannot justify forcing participants/beneficiaries to pay significantly more for a Mutual Fund when passively managed funds with similar investment goals and stock compositions are not made available.

116.    The mere hope that the actively managed mutual funds chosen will outperform the collective wisdom of the market does not justify failing to make index funds available to participants so that they can elect to invest their money in low fee options with substantially similar investment goals.

117.    Here, this behavior is particularly egregious because as described above, the challenged mutual funds selected had not and did not have any sustained periods of outperformance relative to their benchmarks or peers.  When reviewing performance for at least ten years prior to selection, none of the funds listed above outperformed their benchmarks more than 50% of the time.  A prudent fiduciary focused on the sole and exclusive interests of the participants/beneficiaries cannot justify the inclusion of funds that cost, in many cases more than 10 times that of comparator funds on the hopes of outperformance that amount to no better than a flip of the coin.  Moreover, the funds did not perform well after inclusion and Defendant had a duty to remove them from the Plan.  The imprudence in selecting and retaining these funds in the Plan resulted in substantial losses to Plan participants.

**CLASS ACTION ALLEGATIONS**

119.    Plaintiffs bring this action in a representative capacity on behalf of the Plan and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a Class defined as follows:

120. All participants in or beneficiaries of the 99 CENTS ONLY 401(K) PLAN from six (6) years prior to the filing of the complaint through the date of judgment (the "Class Period").

121. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of December 31, 2020, the Plan had 2,715 participants with account balances.

122. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class, which predominate over questions that may affect individual class members, include, *inter alia*:

(a) whether Defendant is a fiduciary of the Plan;

(b) whether Defendant breached its fiduciary duty of prudence with respect to the Plan;

(c) whether Defendant had a duty to monitor other fiduciaries of the Plan;

(d) whether Defendant breached their duty to monitor other fiduciaries of the Plan;

(e) whether Defendant breached its duty to diversify investments; and

(f) the extent of damage sustained by Class members and the appropriate measure of damages.

123. Plaintiffs' claims are typical of those of the Class because their claims arise from the same event, practice and/or course of conduct as other members of the Class.

124. Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action litigation in general and ERISA class actions involving fiduciary breaches in particular.

125. Plaintiffs have no interests that conflict with those of the Class. Defendant does not have any unique defenses against any of the Plaintiffs that

-37-

FIRST AMENDED CLASS ACTION COMPLAINT

would interfere with their representation of the Class.

126.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be too small for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are not aware of any difficulties likely to be encountered in the management of this matter as a class action.

## FIRST CAUSE OF ACTION

### Breach of Fiduciary Duties of Prudence

### (Against All Defendants)

127.    Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

128.    Defendants were fiduciaries of the Plan under ERISA §§3(21) and/or 402(a)(1), 29 U.S.C. §§1002(21) and/or 1102(a)(1) and under common law trust law because they were either designated in the Plan documents as the Plan Administrator, a named fiduciary under the Plan, performed discretionary Plan-related fiduciary functions, including the selection and monitoring of investment options for the Plan, and/or the negotiation over services and fees for the Plan, and/or were responsible for the administration and operation of the Plan.

129.    As a fiduciary of the Plan, Defendants were required, pursuant to ERISA §404(a)(1), 29 U.S.C. §1104(a)(1) and common law, to act: "(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan"; and "(B) to discharge their duties on an ongoing basis with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a

-38-

FIRST AMENDED CLASS ACTION COMPLAINT

like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

130.  Common law and ERISA's duty of prudence required Defendant to give appropriate consideration to those facts and circumstances that, given the scope of its fiduciary investment duties, it knew or should have known were relevant to the particular investments of the Plan and to act accordingly. *See* 29 C.F.R. §2550.404a-1. The Supreme Court has concluded that this duty is "a /// continuing duty to monitor [plan] investments and remove imprudent ones." *Tibble*, 135 S. Ct. at 1828.

131.  As described above, Defendants failed to act prudently and in the best interest of the Plan and its participants and breached its fiduciary duties in various ways. Defendants failed to make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of Plan participants. Defendants selected and retained investment options in the Plan despite their high-cost relative to other comparable investments and failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan. A prudent fiduciary in possession of this information would have removed these investment options, replaced them with more prudent and lower cost alternatives, and/or used the size, leverage and bargaining power of the Plan to secure significantly reduced fees for comparable investment strategies.

132.  In addition, Defendants, and the fiduciaries to whom it delegated authority, breached their duty of prudence by failing to monitor or control excessive compensation paid for recordkeeping services, if any resulted from the unnecessary payment of recordkeeping and other services both directly and as a percentage of assets.

133.  The duty of prudence involves a continuing duty to monitor investments and remove imprudent ones under trust law.

134.  Defendants knowingly participated in each fiduciary breach of the other

-39-
FIRST AMENDED CLASS ACTION COMPLAINT

Plan fiduciaries, knowing that such acts were a breach, and enabled the other Plan fiduciaries to commit fiduciary breaches by failing to lawfully discharge their own duties. Defendants knew of the fiduciary breaches of the other Plan fiduciaries and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each defendant is also liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. §1105(a).

135.   As a direct and proximate result of these breaches, the Plan, Plaintiffs and members of the Putative Class suffered substantial losses in the form of higher fees or lower returns on their investments than they would have otherwise experienced. Additionally and regardless of the losses incurred by Plaintiffs or any member of the Class, pursuant to ERISA §§502(a)(2) and (a)(3), and 409(a), 29 U.S.C. §§1132(a)(2) and (a)(3), and 1109(a), and common law trusts, Defendants and any non-fiduciary which knowingly participated in these breaches are liable to disgorge all profits made as a result of Defendant's breaches of the duty of prudence, and such other appropriate equitable relief as the Court deems proper.'

## SECOND CAUSE OF ACTION

### Breach of Fiduciary Duties in Violation of Duty to Investigate and Monitor Investments and Covered Service Providers

### (Against All Defendants)

136.   Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

137.   Defendants had overall oversight responsibility for the Plan and control over the Plan's investment options through its authority to limit or remove the other Plan fiduciaries.

138.   A monitoring fiduciary must ensure that the monitored

-40-

FIRST AMENDED CLASS ACTION COMPLAINT

fiduciaries are performing their fiduciary obligations, including those with respect to the investment and monitoring of plan assets, and must take prompt and effective action to protect the Plan and participants when the monitored fiduciaries fail to perform their fiduciary obligations in accordance with ERISA and common law trusts.

139. Defendants also had a duty to ensure that other Plan fiduciaries possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendant.

140. Defendants breached its fiduciary monitoring duties by, among other things:

(a) failing to monitor and evaluate the performance of other Plan fiduciaries or have a system in place for doing so, standing idly by as the Plan suffered losses as a result of other Plan fiduciaries' election to continue to pay fees that were significantly higher than what the Plan could have paid for a substantially identical investment products readily available elsewhere, as detailed herein;

(b) failing to monitor the processes by which the Plan's investments were evaluated, which would have alerted a prudent fiduciary to the excessive costs being incurred in the Plan to the substantial detriment of the Plan and the Plan's participants' retirement savings, including Plaintiffs and members of the Class; and

(c) failing to remove fiduciaries whose performance was inadequate, as they continued to maintain excessively costly investments in the Plan, all to the detriment of the Plan and Plan participants' retirement savings;

(d) failing to institute competitive bidding for covered service providers.

-41-
FIRST AMENDED CLASS ACTION COMPLAINT

141. The US Supreme Court in *Tibble v. Edison Int'l* 575 U.S. 523 (2015) accepted a continuing violations theory as to the duty to monitor investments:

> "In short, under trust law, a fiduciary normally has a continuing duty of some kind to monitor investments and remove imprudent ones. A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. In such a case, so long as the alleged breach of the continuing duty occurred within six years of suit, the claim is timely. The Ninth Circuit erred by applying a 6-year statutory bar based solely on the initial selection of the three funds without considering the contours of the alleged breach of fiduciary duty." (Id. at 530.)

142. As in this case, the Plaintiffs in Tibble alleged that their plan fiduciaries had offered "higher priced retail-class mutual funds as Plan investments when materially identical lower priced institutional-class mutual funds were available." (Id. at 525-526.) Three of the higher priced investments, however, had been added to the plan outside of the 6-year statute of limitations. (Id. at 526.) The Court concluded there was a potential violation as to those funds because "a fiduciary is required to conduct a regular review of its investment." (Id. at 528.) Therefore, the extent of damages will run beyond the statutory 6-year period pursuant to the Continuing Violations Doctrine accepted by the United States Supreme Court in *Tibble*, and other applicable cases.

143. As a direct and proximate result of these breaches of the duty to monitor, the Plan, Plaintiffs, and members of the Class suffered millions of dollars of losses. Had Defendant complied with its fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

144. Pursuant to ERISA §502(a)(2) and (a)(3), and ERISA §409(a), 29 U.S.C. §1132(a)(2) and (a)(3), and 29 U.S.C. §1109(a), Defendant is liable to

-42-

FIRST AMENDED CLASS ACTION COMPLAINT

disgorge all fees received from the Plan, directly or indirectly, and profits thereon, and restore all losses suffered by the Plan caused by its breach of the duty to monitor, and such other appropriate equitable relief as the Court deems proper.

**PRAYER FOR RELIEF**

Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request the Court:

- Certify the Class, appoint Plaintiffs as class representatives, and appoint Christina Humphrey Law, P.C. and Tower Legal Group, P.C. as Class Counsel;
- Find and declare that Defendants have breached their fiduciary duties as described above;
- Find and adjudge that Defendants are liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty, including the Continuing Violations Doctrine;
- Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;
- Order Defendants to provide an accounting necessary to determine the amounts Defendants must make good the Plan under §1109(a);
- Find and adjudge that Defendants must disgorge all sums of money received from their use of assets of the Plan;
- Impose a constructive trust on any monies by which Defendants were unjustly enriched as a result of breaches of fiduciary duty or prohibited transactions, and cause Defendants to disgorge such monies and return them to the Plan;
- Surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which an accounting reveals were

-43-

FIRST AMENDED CLASS ACTION COMPLAINT

improper, excessive, and/or in violation of ERISA;

- Order equitable restitution against Defendants;
- Award to Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;
- Order the payment of interest to the extent it is allowed by law; and
- Grant other equitable or remedial relief as the Court deems appropriate.

Dated: June 27, 2022                    **CHRISTINA HUMPHREY LAW, P.C.**
                                        **TOWER LEGAL GROUP, P.C.**


By:     _____
        CHRISTINA A. HUMPHREY
        JAMES A. CLARK
        RENEE P. ORTEGA
        Attorneys for Plaintiffs

-44-
FIRST AMENDED CLASS ACTION COMPLAINT

**CHRISTINA HUMPHREY LAW, P.C.**
Christina A. Humphrey (SBN 226326)
1117 State Street
Santa Barbara, CA 93101
Telephone: (805) 618-2924
Facsimile: (805) 618-2939
Email: christina@chumphreylaw.com

[*Attorneys* for Plaintiffs]

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SALVADOR AQUINO, SUSAN FORD, MONICALAYLE GARCIA, BARBARA KRAUS, MARTHA LOPEZ, FRANCISCO MARTINEZ, MEGAN SARGENT, individually and as a representative of a Putative Class of Participants and Beneficiaries, on behalf of the 99 CENTS ONLY STORES 401(K) PLAN, | Case No. 2:22-cv-01966-SB-AFM |
| Plaintiffs, | Hon. Judge Stanley Blumenfeld, Jr |
| v. | **PROOF OF SERVICE** |
| 99 CENTS ONLY STORES LLC; THE RETIREMENT COMMITTEE OF THE 99 CENTS ONLY 401(K) PLAN; and DOES 1 through 20, | |
| Defendants. | |

I am employed in the County of Santa Barbara, State of California. I am over the age of 18 and not a party to the within action. My business address is 1117 State Street, Santa Barbara, CA 93101.

On June 27, 2022, I served the following document(s):

**1. FIRST AMENDED CLASS ACTION COMPLAINT**

-1-

PROOF OF SERVICE

On the following:

Robyn C. Crowther                              Attorneys for Defendants
*rcrowther@steptoe.com*
Tahir L. Boykins
*tboykins@steptoe.com*
**STEPTOE & JOHNSON LLP**
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9432
Fax: (213) 439-9599


Paul J. Ondrasik                               Attorneys for Defendants
*pondrasik@steptoe.com*
Eric G. Serron
*eserron@steptoe.com*
Zorba Leslie
*zleslie@steptoe.com*
**STEPTOE & JOHNSON LLP**
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
Fax: (202) 429-3902

**TOWER LEGAL GROUP, P.C.**          Attorneys for Plaintiffs
James A. Clark (SBN 278372)
Renee P. Ortega (SBN 283441)
11335 Gold Express Drive, Ste. 105
Gold River, CA 95670
Telephone: (916) 361-6009
Facsimile: (916) 361-6019
Email: james.clark@towerlegalgroup.com
Email: renee.parras@towerlegalgroup.com


[ ]     (VIA US MAIL) I caused such envelope(s) to be deposited in the mail at Santa Barbara, California with postage fully prepaid.  I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  It is deposited with the U.S. Postal Service on that same day in the ordinary course of business.

-2-

PROOF OF SERVICE

[ ]    (VIA OVERNIGHT DELIVERY) I caused to have served such document(s) by depositing them in the drop box at Santa Barbara, California, for priority overnight next day delivery.

[X]    BY ELECTRONIC SERVICE:  the parties listed below were served electronically through PACER, the Court's electronic E-SERVE system with the document(s) listed above by e-mailed PDF files on June 27, 2022. The transmission was reported as complete and without error.

[ ]    (STATE) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

[X]    (FEDERAL) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.


Executed on June 27, 2022.

_Stefano Congedo_
_____
Stefano Congedo

-3-
PROOF OF SERVICE